UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DERRICK A. HOUSTON,

Plaintiff,

Case No. 20-cv-163-pp

v.

PTS OF AMERICA,
PRISON TRANSPORT OF AMERICA,
US CORRECTIONS LLC, MAKALA SHOULDERS,
GRIFFIN, MONTES, ST. CLARE HEALTH CENTER,
and JOHN DOES,

Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), ADDRESSING PLAINTIFF'S MOTIONS TO AMEND COMPLAINT (DKT. NOS. 9, 10) AND SCREENING COMPLAINT

Plaintiff Derrick A. Houston, representing himself, filed a complaint alleging that the defendants violated his civil rights under 42 U.S.C. §1983 for various incidents during his transportation to Wisconsin. Dkt. No. 1. The plaintiff also has filed a motion to proceed without prepaying the filing fee, dkt. no. 2, and two motions to amend the complaint, dkt. nos. 9, 10. This order resolves those motions and screens the complaint.

## I.    Motion to Proceed Without Prepaying the Filing Fee (Dkt. No. 2)

The Prison Litigation Reform Act applies to this case because the plaintiff was incarcerated when he filed his complaint. 28 U.S.C. §1915. That law allows a court to let an incarcerated plaintiff proceed with his case without prepaying the filing fee if he meets certain conditions. One of those conditions

1

is that the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On February 5, 2020, the court ordered the plaintiff to pay an initial partial filing fee of $11.00 by February 26, 2020. Dkt. No. 5. On February 24, 2020, the court received that fee. The court will grant the plaintiff's motion for leave to proceed without prepayment of the filing fee and will allow him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

## II. Motions to Amend the Complaint (Dkt. Nos. 9, 10)

The plaintiff filed two motions to amend the complaint. Dkt. Nos. 9, 10. In the first motion, he states that "[s]ince the filing of the complaint the Plaintiff has determined the name of one of the John Does defendants is Williamson County Sheriff Office. Paragraph 9, on page 7 of 17 in which I refer to unknown place of incident [sic] are amended to reflect the identity where the actions took place." Dkt. No. 9 at ¶2. The plaintiff also seeks an injunction to order US Corrections LLC and the Williamson County Sheriff's Office to "hold all camera and audio footage from November 3 to November 5, 2019." Id. at ¶3. He worries that the evidence is being destroyed because of how long it is taking the court to screen his complaint. Id. at ¶4.

In his second motion for leave to amend, the plaintiff states that "[s]ince the filing of the complaint the Plaintiff has determined that the name of the

2

John Doe defendant is C.O. Stucker Paragraphs (14) on page 8 of 17 in which I refer to John Doe are amended to reflect the identity and the actions of officer at Williamson County Sheriff's Office." Dkt. No. 10 at ¶2.

This court's local rules require that an amended complaint "must reproduce the entire [complaint] as amended, and may not incorporate any prior pleading by reference." Civil Local Rule 15(a) (E.D Wis.). But the court interprets the plaintiff's motions less as requests to amend the claims in the complaint and more as motions to substitute the real identities of John Doe defendants. Motions to substitute don't require the plaintiff to restructure the complaint.

In the first motion, the plaintiff asks to substitute the Williamson County Sheriff's Office as the place where he was tazed. <u>See</u> Dkt. No. 1 at 7 ("At our next stop is where the incident took place.") It appears that the plaintiff also wants to substitute the Williamson County Sheriff's Office as one of the John Doe defendants. The complaint contains no allegations against an institution such as a sheriff's office. Even if it had, the Williamson County Sheriff's Office cannot be sued under §1983. Section 1983 allows a plaintiff to sue a "person" who, acting under color of law, violates his constitutional rights. The Williamson County Sheriff's Office is not a person but a municipal entity. While there are some circumstances in which a municipal entity can be sued, <u>see</u> <u>Monell v. Dept. of Social Servs. of City of New York</u>, 436 U.S. 658 (1978), a sheriff's office "is not a legal entity separable from the county government which it serves," and is not subject to suit under §1983. <u>Whiting v. Marathon</u>

<u>Cty. Sheriff's Dept.</u>, 382 F.3d 700, 704 (7th Cir. 2004). So, while the court will note that the location of the incident described on page seven of the plaintiff's complaint is the Williamson County Sheriff's Office, it will deny the plaintiff's motion to substitute the sheriff's office as a defendant. As for the plaintiff's request that the court order US Corrections LLC and the Williamson County Sheriff's Office to hold preserve audio and video footage, that request is premature at this stage in the litigation and without some basis for believing that the evidence is being destroyed.

On page eight of the complaint, the plaintiff describes the actions of an "unknown female defendant [who] was violently pulling on my leg restraints" and describes the female as "approximately 5'4" white female, brown hair, unknown name." Dkt. No. 1. at 8. In his second motion, the plaintiff identifies this unknown defendant as C.O. Stucker. The court will grant his motion to substitute C.O. Stucker for the Doe placeholder.

**III.  Screening the Complaint**

    A.    <u>Federal Screening Standard</u>

Under the Prison Litigation Reform Act, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

4

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court liberally construes complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

5

B.  Allegations in the Complaint

The plaintiff alleges that on October 30, 2019, officers of "PTS of America, Prison Transport of America, US Corrections LLC 'PTS' out of White Creek, Tennessee" picked the plaintiff up from Orange County, Florida. Dkt. No. 1 at 3. While awaiting transport at an Orange County Department of Corrections institution, defendant Makala Shoulders broke the plaintiff's phone. Id. Shoulders apologized to the plaintiff and said that a report would be made. Id. On November 2, when the plaintiff arrived at a facility in Tennessee, Shoulders "gave verification of the broken phone" at the Tennessee facility and "tr[i]ed to leave monies at this institution for the broken property." Id. However, she was unable to do so "due to this facility [sic] rules." Id.

On October 31, 2019, an "unknown Caucasian male defendant" picked up an unknown inmate (who was headed for a location in Georgia) who allegedly was HIV-positive. Id. The plaintiff alleges that unspecified PTS officers allowed the plaintiff to share food and drink with the HIV-positive inmate, even though they knew "of the potential circumstances at hand." Id.

On November 3, 2019, the plaintiff "was picked up by two different PTS of American, Prison Transport America, US Corrections LLC 'PTS' Officers, 517 Hickory Hills Blvd White Creek, Tennessee"—Officer Griffin and an unknown female officer. Id. at 4. According to the plaintiff, Griffin stated, "If you guys are good to me, I'll be good to you, but if you act out or disobey my orders, I'll make your ride a living hell to remember." Id. Forty-five minutes after Griffin made these statements, the transport arrived in Kentucky to pick up five additional

6

inmates. Id. Griffin allegedly said to one of the inmates, "If you try anything, I will not hesitate to use my service weapon." Id. When they left the spot in Kentucky, all the inmates were given water bottles. Id. at 5. After some time on the road, an inmate named "Will" urinated into his empty water bottle, and ten or fifteen minutes later, the plaintiff "had no choice but to do the same thing." Id. At some point, Will needed to use the bathroom again; another inmate gave Will that inmate's empty bottle to use. Id. After some time—the plaintiff does not recall how long—Will had to use the restroom again. Id. The plaintiff and another inmate attempted to get the officers' attention on the camera and yelled into the voice-box. Id. When that failed, they yelled to the female inmates, who notified the officers. Id. The van pulled to the right side of the road and stopped, causing the plaintiff to fall off the bench and his right leg-shackle to tighten. Id.

Griffin then opened the door and yelled at the plaintiff and his fellow inmates, telling them that they get regularly scheduled bathroom breaks every four to six hours, and that the van was not going to stop every time one of them needed to use the bathroom. Id. at 6. The plaintiff says that he blurted out that this was "inhumane, you can't do that." Id. Griffin responded that "he runs the show" and the plaintiff needed "to shut his mouth." Id. The plaintiff responded that Griffin could not stop him from talking. Id. Griffin then told the other inmates that if the plaintiff did not stop talking "[Griffin was] going to make it worse on everybody else." Id. Griffin then began counting down from fifteen, and the plaintiff began to explain that because they were given

7

infrequent bathroom breaks, the inmates had to urinate into empty bottles. Griffin concluded his countdown and, because the plaintiff did not stop talking, Griffin stated that everyone would receive tartar sauce sandwiches, then slammed the door. Id.

The transport van arrived at an unknown location forty-five minutes later, and the plaintiff noticed that his leg shackle was very tight. Id. When the inmates entered the institution, Griffin told all the inmates that because of the plaintiff's "mouth" everyone would be receiving tartar sauce sandwiches. Id. The plaintiff said he did not think that would be legal, and Griffin responded that he had done it before. Id. The plaintiff and Griffin then began to argue over the legality of serving tartar sauce sandwiches. Id. The plaintiff said he did not think that would cover the calorie intake value for a meal; Griffin responded that every inmate thinks he is a lawyer and promised to give the inmates two pieces of Wonder bread, tartar sauce and water. Id. The plaintiff asked if he could have his leg-shackle loosened because he had had surgery on his ankle. Id. Griffin responded that the plaintiff would be fine. Id.

At the next stop, identified in the plaintiff's first motion to amend as the Williamson County Sheriff's Office, everyone got out of the van and was lined up in the sally-port. Id. at 7. Griffin told the inmates that "he ha[d] a solution to the problem at hand" and stated that everyone would be fed "[except] for Mr. big mouth." Id. The plaintiff said he could care less but would appreciate it if Griffin would loosen his leg-shackle because of the tightness and the past surgery. Id. Griffin responded that the plaintiff needed to walk right then. Id.

8

The plaintiff asked how Griffin expected him to walk when the plaintiff was in pain and said that what he was telling Griffin was in his paperwork. Id. Griffin told the plaintiff to just move his feet and began to count. Id. An inmate behind the plaintiff stated that Griffin "was on a power trip." Id. The plaintiff responded, "I know." Id. At that point, Griffin put his hands on the back of the plaintiff's neck. Id. The plaintiff told Griffin "don't put your fucking hands on me." Id. The plaintiff felt a pain in his lower left back and fell on to the ground face first, not able to catch himself because of the chain around his waist and the cuffs on his hands. Id. He tried to turn to the side, hitting his head and shoulder. Id. The plaintiff says he was in excruciating pain and was "dazed from the impact." Id. The plaintiff reports that he said to Griffin, "Why the hell did you just taze me?" Id. Griffin ordered the plaintiff to get up, but the plaintiff refused to, stating he would not move until he could be seen by medical personnel. Id. Griffin again ordered the plaintiff to get up, the plaintiff again said he would like medical treatment, then Griffin began to count from three. Id. After Griffin finished counting, the plaintiff was "O.C. sprayed" and yelled for help. Id. The plaintiff says Griffin was the person who O.C. sprayed him. Id. at 8.[1]

The plaintiff says that "Officer Griffin had the defendant 'women' take all the inmates into this facility." Id. Griffin got louder, telling the plaintiff to get up, and resumed shaking the OC can. Id. The plaintiff responded, "Are you

---

[1] The court assumes that by "O.C." spray, the plaintiff means oleoresin capsicum spray, commonly known as "pepper spray."

9

fucking stupid there's a camera right there." Id. Griffin did not spray the plaintiff a second time. Id.

The plaintiff says that at this point "everything went blink [*sic*];" he speculates that one of the defendants at the facility may have kicked him in the head. Id. He realized "what was going on" when "an unknown female defendant was violently pulling on [his] leg restraints." Id. He says he was in excruciating pain and he saw the female defendant. Id. As indicated in the plaintiff's second motion to amend, this unknown female defendant was C.O. Stucker. Dkt. No. 10. The plaintiff says that other defendants were laughing at him because C.O. Stucker and another female officer were "handling" him. Dkt. No. 1 at 8. At this point, Griffin allegedly was telling the plaintiff to get up and pulled out his taser again. Id. The plaintiff says that he was crying, out of fear and because of the OC spray, and told Griffin he could not get up. Id. Griffin told him he could. Id. The plaintiff asked all the defendants for medical care, but the defendants told him that he was talking fine and didn't appear to need medical treatment. Id.

The plaintiff says that he felt a sharp pain around his waist, like someone pulling at the chain, and that two unknown female officers were pulling his arms forcefully. Id. The plaintiff says that while the defendants were escorting him to the van, he asked if he could be decontaminated, and the defendants responded that he "should have thought about that beforehand." Id. at 9. The plaintiff responded, "fuck you, bitch," and was subsequently struck in the side and pushed into the van. Id. Griffin had the plaintiff by the

10

back of the neck, and the plaintiff told Griffin that Griffin had "to get this shit out of my eyes." Id. The plaintiff says that he was immediately tazed again. Id. The plaintiff says he ended up face-down in the van and was tazed five to six more times. Id. He says Griffin kept telling him to get up even though Griffin knew that was impossible. Id.

About five minutes later, after the plaintiff was "put into the small cage," two inmates were put in the side of the van. Id. One of the inmates was "Will;" the plaintiff does not know the name of the other inmate. Id. The plaintiff says that the "unknown defendant"—the second inmate—had on jeans and a reddish shirt. Id. The plaintiff asked an officer if he could the restroom, and the van door "was slammed on [his] request." Id. The plaintiff said, "ok th[e]n I'll just piss on the floor." Id. As the plaintiff began to urinate on the floor, the inmate in the reddish shirt yelled, "This fucking dumb mother fucker pissing on the floor." Id. Griffin took the two inmates out of the van and then told the plaintiff to get out. Id. at 10. When the plaintiff asked if he was going to see medical personnel, Griffin "started shaking his ma[c]e."[2] Id. The plaintiff complied with Griffin's orders. Id. The plaintiff says he noticed as he was getting out of the van that there were "a water holes," and he asked if he could be rinsed off. Id. The plaintiff says he was told to sit down on the floor; instead

---

[2] The complaint refers to a "mase" can. "Mace" is the brand name of a chemical self-defense spray; it is not the same thing as oleoresin capsicum spray. The court believes that whatever chemicals were in the can—pepper spray or mace—the plaintiff is referring consistently to some kind of chemical self-defense spray.

of sitting down, the plaintiff squatted. Id. Griffin then came up behind him and kicked the plaintiff's legs out from under him while pulling the plaintiff's shirt backwards, causing him to sit back on the wet floor and get his socks wet (since he did not have on shoes). Id. Griffin then put some cleaning solution in the van and used the water holes to rinse it out. Id.

Once the van was cleaned, the plaintiff was placed back into the "seg cage." Id. The plaintiff says that the chemicals that were on him "reactivated" because of the wet conditions and he yelled to the officers about the situation. Id. The plaintiff says the inmate in the reddish shirt was laughing at him and even though he was kicking on the van wall and yelling, nothing was done. Id. Seeing a half-full water bottle on the floor, the plaintiff tried to use that to rinse off, but couldn't because of his restraints. Id. The water poured out onto the floor. Id. When this happened, the inmate in the reddish shirt yelled to the officers that the plaintiff was urinating again. Id. at 11. The van stopped, and Griffin informed them they could not go back into the institution. Id. The plaintiff alleges that Griffin then whispered something to the inmate in the reddish shirt and stated, "he will feed him good for the situation." Id. The plaintiff asked defendant Montes "for the second or third time" if he could have medical attention. Id. When Montes asked him "what for," he told her that he was having a hard time breathing. Id. Montes responded that he was talking just fine. Id.

The plaintiff then began banging on the segregation cage's walls with his feet, and the inmate in the reddish shirt allegedly told him "if he could get his

12

hands on me, he would f-me up." Id.  The plaintiff responded that the inmate was talking that way only because they were restrained "and are not in each other's face," but the inmate in the reddish shirt then told the plaintiff that he did not have a chain around his waist and could get to the plaintiff. Id. The inmate with the reddish shirt then told Will to switch spots with him because Will was closest to the segregation cell door. Id. Once they switched, the inmate in the reddish shirt grabbed the top of the segregation cage violently and began to spit on the plaintiff. Id. at 12. The plaintiff yelled to the officers, but nothing was done. Id. The plaintiff began banging on the van walls; the air conditioning was "knowingly" turned up to "high." Id. The plaintiff was wet; he used the bathroom on himself and on the floor. Id.

At some unspecified point later, the other inmates in the transport van received a meal, and the two inmates in the front of the van got Taco Bell. Id. The plaintiff received a tartar sauce sandwich thrown to him through the top trap, which landed in his urine on the floor. Id.

The van then arrived at another unknown location. The plaintiff overheard Griffin telling three or four of the institution's officers how much of a problem the plaintiff was. Id. When they took him out to clean the van, one of the officers, a "brown shirt L.T.", asked the plaintiff if he was going to be a problem. Id. The plaintiff told this lieutenant that he never was a problem and asked, "why are they trying to take me out of the van?"; "the lieutenant answered the question by stating to clean the van out, fix your restraints and offer you a bathroom break." Id. at 13. The plaintiff responded that he didn't

13

need a bathroom because he already had soiled himself, and he asked to see medical personnel; the van doors were closed on him. Id.

The plaintiff says that the other inmates were loaded back on the van but that he was not offered the opportunity to use the bathroom; his hands were behind his back and every time he went, he went on himself. Id. The plaintiff says he already had urine and feces on himself. Id. The plaintiff alleges that when the van departed, he was not put in a seat belt. Id. He says the officers knew about swelling in his hand and finger, but they still put the cuffs on backward and drove maliciously and recklesslessly, throwing the plaintiff against the walls of the segregation cage "for hours." Id. The plaintiff says he yelled and banged for the officers, but the radio was turned on high. Id. The movement reactivated the chemicals on his clothes, causing breathing problems. Id. The plaintiff says that he repeatedly told defendants that he could not breathe. Id. At some point, the brakes were hit hard; the plaintiff says he hit the front wall and became trapped in the floor, unable to get up for hours. Id.

On November 4, 2019, the plaintiff went to "SSM Health St. Clare Fenton" in Fenton, Missouri. Id. at 14. He alleges that the medical professionals were independent contractors. Id. They performed an EKG on the plaintiff, x-rayed his right hand and asked him questions about his pain. Id. The plaintiff told them he was having problems in his "left knee, right ankle, sternum, lower back, abdomen, ribs, left arm, [and] right hand." Id. He also told them that he was having a hard time seeing and breathing. Id. He states

14

that the doctors at St. Clare did not give him any results or diagnostics, nor did medical staff treat any of the injuries he complained about except for treating his eyes with a solution. Id. The plaintiff states the medical personnel spoke with Griffin instead of him. Id.

The plaintiff alleges he heard Griffin talking about him with an unknown nurse the hallway. Id. Griffin told her how the plaintiff soiled himself, explaining that that was why the plaintiff smelled so bad. Id. The plaintiff then heard Griffin talking to two hospital security guards about why the plaintiff was incarcerated. Id. The plaintiff says he told all the officers that it should not matter what someone was locked up for if they are getting checked out medically. Id.

The plaintiff says that a pregnant nurse attempted to give the plaintiff his discharge papers, but Griffin stepped in and told her that the plaintiff was not allowed anything. Id. at 15. Griffin took the discharge papers. Id. Griffin took the plaintiff from his hospital bed and placed him back into the segregation cage. Id.

The plaintiff alleges that at another unknown location, while in the sally port, Griffin pulled Will out of the van by the shirt and smashed Will's head against a wall, knocking him unconscious. Id. The plaintiff began yelling at Griffin, but Griffin dragged Will away by his shirt. Id. Approximately fifteen minutes later, an ambulance arrived to rush Will to the emergency room. Id.

Montes took the inmates to an unknown institution. Id. An unknown officer let the plaintiff shower "to decontaminate himself." Id. The plaintiff says

the officer started coughing because of the chemicals. Id. An hour later, the inmates were put back in the van; the inmate in the reddish shirt was put on the same side as the plaintiff and "his actions continued." Id.

On November 5, 2019, the plaintiff arrived at Brown County Jail in Green Bay, Wisconsin. Id. He immediately put in a medical request complaining about his pain. Id. The nursing staff at Brown County Jail saw the plaintiff on November 8, 2019, and they made a report of his injuries. Id.

The plaintiff demands $10.5 million and that the defendants "be held accountable by (3) weeks without pay." Id. at 16. He also demands that the defendants undergo retraining and anger-management classes, and demands a change to company policy regarding how many hours a driver can drive. Additionally, he wants a policy limiting the use of tasers. He is suing the defendants in their "individual and professional capacity." Id.

    C.    <u>Analysis</u>

        1.    *Liability under § 1983*

The plaintiff makes many allegations against many defendants. A few of these defendants cannot be held liable under §1983. Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." <u>Hildebrant v. Ill. Dep't of Nat. Res.</u>, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting <u>Vance v. Peters</u>, 97 F.3d 987, 991 (7th Cir. 1996)). Because §1983 makes public employees liable "for their own misdeeds but not for anyone else's," <u>Burks v. Raemisch</u>, 555 F.3d 592,

16

596 (7th Cir.2009), a plaintiff must specifically allege what each individual defendant did (or did not do) to violate his constitutional rights. And under §1983, a plaintiff may sue a "person," acting under color of law, who violated his constitutional rights. See Monell, 436 U.S. 658 (1978).

The plaintiff has sued the St. Clare Health Center and unknown medical personnel employed by St. Clare. Dkt. No. 1 at 14. He also sues "PTS of American, Prison Transport America, US Corrections LLC . . . 517 Hickory Hills Blvd White Creek, Tennessee" and various officers, some unknown, employed by this entity, including named defendants Griffin and Montes Id. at 4.

St. Clare Health Center appears to be a private entity. https://www.ssmhealth.com/locations/st-clare-hospital-fenton. It is a not a person and it is not a government entity. There are some circumstances under which a private entity can face liability for civil rights violations. See Glisson v. Ind. Dep't of Corr., 849 F.3d 372, 379 (7th Cir. 2017). A plaintiff can sue a private corporation under §1983 if that private corporation "has contracted to provide essential government services," is "subject to at least the same rules that apply to public entities" and it is the entity's "policy or custom [that] gave rise to the harm (that is, caused it)." Id. at 378-79 (citations omitted). The court cannot tell whether St. Clare Health Center contracted to provide essential government services or was subject to at least the same rules that applied to public entities, and the plaintiff has not alleged that St. Clare Health Center had a policy or custom of failing to treat people or acting

17

unprofessionally (which is not a constitutional violation). The court will not allow the plaintiff to proceed on a claim against St. Clare Health Center.

The plaintiff does not state whether PTS of America, Prison Transport America and US Corrections LLC ("PTS") are three separate entities or one entity,[3] but they are private entities. The body of the complaint does not allege that any of these entities violated the plaintiff's constitutional rights. In the prayer for relief, the plaintiff requests changes to the company policy related to how many hours a driver may drive without sleep. Dkt. No. 1 at 16. He also requests a policy limiting taser usage. Id. These requests are not sufficient to state claims for corporate policies that result in constitutional violations. The plaintiff does not describe the driving policy or explain how that policy resulted in an alleged violation of his rights. He does not describe the company policy on taser usage or explain how that policy resulted in a violation of his rights. While courts must liberally construe pleadings filed by self-represented plaintiffs, courts cannot "accept as adequate abstract recitations of the elements of a cause or action or conclusory legal statements." Twombly, 550 U.S. at 570. The plaintiff court will not allow the plaintiff to proceed against PTS of America, Prison Transport America, or US Corrections LLC.

The plaintiff sued employees of both St. Clare Health and PTS. Under

---

[3] The web site https://prisonertransport.net indicates that Prisoner Transportation Services is the "home" of US Corrections, US Prisoner Transport and PTS of America.

18

§1983, private entities are not liable for the actions of their employees under a theory of *respondeat superior*, but there are still some instances where the employees of those private entities may be liable. Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 830 (7th Cir. 2009). To allege liability on the part of the employees of a private entity, the plaintiff must show that the individuals were acting under color of state law. Id. at 823. For an employee of a private entity to act under the color of state law, there must be a "'close nexus between the State and the challenged action' [so] that the challenged action 'may fairly be treated as that of the State itself.'" Id. (quoting Jackson v. Metro Edison Co., 419 U.S. 345, 352 (1974)). The question is whether "the alleged infringement of federal rights [is] 'fairly attributable to the State?" Id. (quoting Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982)). Where the state contracts with a private entity for prison services for which the prison is typically responsible, generally this sufficiently establishes the required nexus. See Shields v. Ill. Dept of Corr., 746 F.3d 782 (7th Cir. 2014).

For cases where the private entity in question is a health care provider, the court must examine the "trilateral relationship" between the person in custody, the state and the private health care provider, including (1) the setting in which the medical care is rendered (*i.e.*, whether the service is provided outside the prison walls); (2) the contractual relationship between the state and the medical care provider (*i.e.*, whether the service was voluntary); and (3) the relationship of the private provider to the person in custody (*i.e.*, whether the private provider is replacing medical care or simply

19

assisting with medical care). <u>Rodriguez</u>, 577 F.3d at 826.

The plaintiff has not alleged facts to state a claim that St. Clare Health Center employees were acting under the color of state law. The unnamed employees work at what appears to be a hospital. They interacted with the plaintiff outside of any prison or jail walls, while the plaintiff was in transit from one facility to another. While the plaintiff states that St. Clare Health is an independent contractor, he does not state with whom or provide any facts to support that assertion. Dkt. No. 1 at 14. Nothing in the complaint indicates that St. Clare Health was under contract with a jail, prison or other state entity. It appears that the St. Clare Health Center employees provided the plaintiff with medical care as they would have any other member of the public, not as a replacement for institutional medical care. The court will not allow the plaintiff to proceed on claims against the unknown John and Jane Does employed by St. Clare Health.

On the other hand, the plaintiff has alleged sufficient facts to support the conclusion that the employees of PTS were acting under the color of state law. For the purposes of screening, the court will infer that PTS contracted with various state entities to provide transport of their inmates, a prison service that for which the state is typically responsible. The court will analyze the plaintiff's claims against both the named and unnamed defendants employed by PTS.

      2.    *The Claim Against Makala Shoulders*

The plaintiff claims that defendant Makala Shoulders broke his phone.

Dkt. No. 1 at 3. The plaintiff does not say whether Shoulders was an inmate, a prison staff member or an employee of PTS. The court can infer that Shoulders was not an inmate, however, because the plaintiff says that when Shoulders apologized for breaking the phone, she said a report would be made. It appears that Shoulders broke the plaintiff's phone by accident.

The plaintiff *does* say that Shoulders broke his phone in Orange County, Florida. He does not say where—in what state—Shoulders lives or works. That means that the Eastern District of Wisconsin may not be the proper venue—location—for this claim. Under 28 U.S.C. §1391(b), "A civil action may be brought (1) in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." The court does not know the proper venue under subsection (1) because the plaintiff has not indicated Shoulders' place of residence. Under subsection (2), the appropriate venue for this claim is in Florida because Shoulders allegedly broke the plaintiff's cell phone in Florida. The court cannot determine whether venue is proper under subsection (3) because again, the court cannot tell whether Shoulders would be subject to the court's personal jurisdiction; if she is a resident of a state other than Wisconsin and has no

21

connection with Wisconsin other than her interaction with the plaintiff, venue would not be proper here.

Even if venue is proper in Wisconsin (and the court doubts that it is), the plaintiff has not stated a claim against Shoulders under §1983. Where a state official, through random and unauthorized actions, causes a deprivation of property, the official violates a plaintiff's due process rights only where there is no "adequate post-deprivation remedy." Johnson v. Wallich, 578 F. App'x. 601, 602 (7th Cir. 2014). The plaintiff has an adequate post-deprivation remedy—under §806.13 of the Florida statutes, a person can be prosecuted for willfully or maliciously damaging someone else's property, and Florida also has a civil theft statute, F.S. §772.11(1). Because the complaint does not state a claim against Shoulders for which a federal court may grant relief, the court will dismiss Shoulders as a defendant.

### 3. *The Failure to Protect Claim for HIV Exposure*

The plaintiff alleges that on October 31, 2019, while the transport van was *en route* to Tennessee, it picked up an inmate who was HIV positive. Dkt. No. 1 at 3. The plaintiff claims that unspecified defendants—presumably PTS employees—allowed him to share food and drink with this HIV positive inmate. The plaintiff does not explain whether he was a pretrial detainee at the time of these events—that matters, because the Fourteenth Amendment reasonableness standard governs failure-to-protect claims from pretrial detainees and the Eighth Amendment deliberate indifference standard governs such claims for convicted prisoners. See, *e.g.*, Kingsley v. Hendrickson, 576

22

U.S. 389, 400 (2015). For screening purposes, the court will apply the Eighth Amendment standard to all of the plaintiff's allegations, because the Seventh Circuit has held that "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009). Id.

 "A prison official is liable for failing to protect an inmate from another prisoner only if the official 'knows of and disregards an excessive risk to inmate health or safety.'" Gervas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "A claim that a prison official was deliberately indifferent to such a risk has both an objective and subjective component. First, the harm to which the prisoner was exposed must be an objectively serious one. . .. [Second], the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable." Id. (citations omitted).

The plaintiff has not stated a claim against the defendants whom he claims knowingly allowed him to share food and drink with an HIV-positive prisoner. The plaintiff has not alleged facts showing that the risk to which the officers exposed him—even if they knew the other inmate was HIV-positive— was objectively serious. HIV is not transmitted by sharing dishes, silverware or drinking glasses; in very rare cases, it may be transmitted by eating food pre-chewed by someone who is HIV-positive. https://www.hiv.gov/hiv-basics/ overview/about-hiv-and-aids/how-is-hiv-transmitted; https://www.cdc.gov/ hiv/basics/hiv-transmission/not-transmitted.html. Sharing food and drink one

23

time with an HIV-positive person does not constitute an objectively serious risk, even if the defendants knew that the inmate was HIV-positive.

The plaintiff also alleges that the defendants "allowed" him to share food with the HIV-positive inmate. It is not clear what this means. He does not explain whether they simply observed him voluntarily sharing food with the other inmate, or whether they provided food that had to be shared. The plaintiff does not explain how the officers knew the inmate was HIV-positive or provide any evidence that they knew the inmate posed a risk to the plaintiff. The court will not allow the plaintiff to proceed on a failure-to-protect claim against the John Doe officer.

4. *The Claim for Denial of Access to a Bathroom*

The plaintiff alleges that defendant Griffin, a Jane Doe PTS officer and other unknown PTS officers violated his constitutional rights by denying him access to a bathroom, forcing him to urinate in a water bottle and at one point, causing him to urinate and defecate in the segregation cell. Dkt. No. 1 at 6, 11. Prison officials "violate the Eighth Amendment if they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities.'" Budd v. Motley, 711 F.3d 840, 842 (7th Cir. 2013) (quoting Farmer, 511 U.S. at 825.) Depriving an inmate of access to a bathroom for several hours to the point where the inmate is forced to defecate and urinate on the floor and sit in it sufficiently states a claim under the Eighth Amendment for screening purposes. Ghashiyah v. Frank, No. 07-c-308, 2007 WL 2061053 at *8-9 (W.D. Wis. July 12, 2007) (quoting Hope v. Pelzer, 536 U.S. 730, 738

24

(2002)). The plaintiff may proceed on a conditions-of-confinement claim for deprivation of bathroom access against Griffin and the unknown PTS officers ("John Doe Officers—Bathroom Claim").

> 5. *The Claim for Inadequate Nutrition*

The plaintiff asserts that defendant Griffin violated his constitutional rights by feeding him tartar sauce sandwiches and leaving a sandwich on the floor of his urine-soaked segregation cage. Dkt. No. 1 at 6, 12. "The Constitution mandates that prison officials provide inmates with 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.'" Smith v. Dart, 803 F.3d 304, 312 (7th Cir. 2015) (quoting French v. Owens, 777 F.2d 1250, 1255 (7th Cir. 1985)).

It appears that the plaintiff's claim may be *de minimis*. The complaint appears to allege that for one, single meal, Griffin provided only a tartar sauce sandwich and that the plaintiff was not able to eat it because it was tossed into the van through the trap and landed in the urine on the van floor. While inmates should not be treated this way, a deprivation of one meal may not be sufficient to state a conditions-of-confinement claim. Because the court cannot tell at this early stage whether this was a single incident, however, the court will allow the plaintiff to proceed against Griffin on a conditions-of-confinement claim that Griffin deprived him of adequate nutrition.

> 6. *The Excessive Force Claims*

The plaintiff alleges that after arriving at the Williamson County Sheriff's

25

Office, Griffin, C.O. Stucker and other unknown defendants used excessive force against him. Dkt. No. 1 at 7-9. Specifically, he asserts that Griffin tazed him several times and used OC spray, while Stucker and other unknown defendants aggressively manhandled him including kicking him in the head and knocking him unconscious. Id.

The Eighth Amendment's Cruel and Unusual Punishment clause prohibits the use of excessive force, and "'the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Gomez v. Randle, 680 F.3d 859, 864 (7th Cir 2012) (quoting Hudson v. McMillian, 503 U.S. 1, 6-7 (1992)). The plaintiff has sufficiently alleged an excessive force claim against Griffin, C.O. Stucker, and the unknown officers ("John Doe Officers—Williamson County") for the events that happened while stopped at the Williamson County Sheriff's Office. The plaintiff stated that after the first round of tazing and OC spray, he was too incapacitated to comply with Griffin's orders. Regardless, Griffin tazed him five to six more times, and the others continued to rough him up. These allegations are sufficient to state a claim that the defendants' actions were maliciously and sadistically intended to cause harm.

       7.   *Deliberate Indifference to Medical Needs Claim*

After the several tazings and exposure to OC spray, the plaintiff repeatedly asked Griffin, Montes and unknown defendants, including the "Brown Shirt L.T.," for medical care. Dkt. No. 1 at 8, 12. A prison official

violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" Roe v. Elyea, 631 F.3d 843 857 (7th Cir. 2011) (quoting Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010). A plaintiff must provide evidence "that an official *actually* knew of and disregarded a substantial risk of harm." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (citation omitted). A prison official may show deliberate indifference by failing to act or do anything to address the serious medical need. See Gayton, 593 F.3d at 623-624 (reversing summary judgment in favor of a nurse who refused to examine or treat a vomiting inmate). An official also may show deliberate indifference by delaying necessary treatment, aggravating a condition or needlessly prolonging a plaintiff's pain. Gomez, 680 F.3d at 865-66.

Although it appears that the defendants took the plaintiff to St. Clare Health Center the day after he allegedly was repeatedly tazed and sprayed with

27

OC spray, at this early stage the plaintiff has stated a claim for deliberate indifference to medical needs against Griffin, Montes and the unknown officers, including "Brown Shirt L.T." ("John Doe Officers—Medical Needs Claim"). The plaintiff has alleged that he told these defendants that he was having difficulty breathing, which can be a serious and life-threatening condition that warrants immediate attention. The plaintiff alleges that even the small delay of one day aggravated his condition. The court will allow him to proceed on this claim.

8.     *The Soiled/Contaminated Clothing Claim*

The plaintiff claims that Griffin, Montes and unknown PTS officers violated his constitutional rights by knowingly leaving him in a wet segregation cage wearing clothes contaminated by pepper spray, urine and feces (and at one point, subjecting him to very cold air from the air conditioner). These allegations are sufficient to state a conditions-of-confinement claim against Griffin, Montes and other unknown PTS officers ("John Doe Officers—Seg Cage"). See Brooks v. Milwaukee Cty. Sheriff's Dept., No. 18-cv-1767, 2019 WL 3779554 at * 3 (E.D. Wis. Aug. 12, 2019).

9.     *The Claim for Failure to Protect the Plaintiff from Another Inmate*

The plaintiff asserts that Griffin and unknown PTS officers failed to protect him from the inmate in the reddish shirt; he even asserts that they induced the inmate in the reddish shirt to attack him by leaving the inmate unchained. Dkt. No. 1 at 11. "The Eighth Amendment's prohibition on cruel and unusual punishment 'requires prison officials to protect prisoners from

28

violence at the hands of other prisoners.'" Whitelaw v. Foster, No. 16-C-982, 2018 WL 324890 at *3 (E.D. Wis. Jan. 6, 2018) (quoting Brown v. Budz, 398 F.3d 904, 909 (7th Cir. 2005) (citations omitted)). A plaintiff sufficiently pleads a failure to protect claim where he alleges that "(1) 'he is incarcerated under conditions positing a substantial risk of harm,' and (2) defendant-officials acted with 'deliberate indifference' to that risk." Brown, 398 F.3d at 909 (quoting Farmer, 511 U.S. at 834). The plaintiff has stated a failure to protect claim against Griffin and the unknown PTS officers ("John Doe Officers—Failure to Protect Claim") who allegedly encouraged the inmate in the reddish shirt to attack the plaintiff.

### 10. *The Driving Injury Claim*

Finally, the plaintiff claims that at one point, the driver of the van, knowing that the plaintiff did not have on a seatbelt, "maliciously and recklessly" drove the van for the purpose of injuring the plaintiff. Dkt. No. 1 at 13. The Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain.'" Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). The plaintiff alleges that the unknown driver drove recklessly with the intention of hurting him and as a result, the plaintiff sustained several injuries. He may proceed on a claim against the unknown driver ("John Doe—Driver").

### 11. *Official Capacity*

The plaintiff states he is suing the defendants in their "individual and

professional capacity." Dkt. No. 1 at 16. The court suspects that the plaintiff meant "individual and official capacity." Claims against state employees in their official capacities are deemed to be claims against a state for Eleventh Amendment immunity purposes. See Kentucky v. Graham, 473 U.S. 159, 165–66, (1985) (citing Monell, 436 U.S. at 690 n. 55 (1978)); Garcia v. City of Chi., Ill., 24 F.3d 966, 969 (7th Cir.1994). This means that the plaintiff cannot seek monetary damages against the defendants in their official capacities, Graham, 473 U.S. at 169, but may seek injunctive relief, Quern v. Jordan, 440 U.S. 332, 332 (1979). The plaintiff is seeking injunctive relief—he asks the court to require the defendants to undergo more training regarding use of tasers and to require implementation of policies regarding taser usage and the amount of time van drivers may drive without breaks. He may proceed against the defendants in both their individual and official capacities as to these forms of relief.

**IV.    Miscellaneous**

The plaintiff has written to the court a couple of times, asking about discovery procedures. Dkt. Nos. 15, 16. The plaintiff is getting ahead of himself. The next step in the process is for the court to serve the complaint on the defendants. The defendants will have the opportunity to answer or otherwise respond to the allegations. Once the defendants have answered, the court will issue a scheduling order setting deadlines for completing discovery and for filing dispositive motions. This order will provide the plaintiff with information about how the court expects the parties to conduct discovery. Until the court

30

issues the scheduling order, there is nothing that the plaintiff needs to do.

## V.    Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES AS UNNECESSARY** the plaintiff's first motion to substitute the identity of a John Doe defendant. Dkt. No. 9.

The court **GRANTS** the plaintiff's second motion to substitute the identity of the John Doe defendant, Dkt. No. 10. The court **DIRECTS** the Clerk of Court to add C.O. Stucker as a defendant.

The court **DISMISSES** defendants PTS of America, Prison Transport of America, US Corrections LLC, Makala Shoulders and St. Clare Health Center as defendants.

The court **ORDERS** the U.S. Marshals Service to serve a copy of the complaint and this order on defendants PTS Officer Griffin, PTS Officer Montes, and C.O. Stucker under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

31

The court **ORDERS** that defendants PTS Officer Griffin, PTS Officer Montes and C.O. Stucker must file a responsive pleading to the complaint.

The court **DIRECTS** the Clerk of Court to replace all current John Doe placeholders with the following John Doe placeholders to the case: John Doe Officers—Bathroom Claim; John Doe Officers—Williamson County; John Doe—Brown Shirt L.T.; John Doe Officers—Medical Needs Claim; John Doe Officers—Seg Cage; John Doe Officers—Failure to Protect Claim; John Doe—Driver.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and for filing dispositive motions. After the court enters the scheduling order, the plaintiff may make discovery requests (written questions or requests for documents) on the named defendants in an effort to uncover the identity of the following John Does: John Doe Officers—Bathroom Claim; John Doe Officers—Williamson County; John Doe—Brown Shirt L.T.; John Doe Officers—Medical Needs Claim; John Doe Officers—Seg Cage; John Doe Officers—Failure to Protect Claim; John Doe—Driver. Once he knows the real names of these defendants, he must file a motion asking the court to substitute the real name for the Doe placeholders. Again, the plaintiff should not serve any discovery request upon the named defendants until *after* the court enters a scheduling order.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$337.30** balance of the filing fee

by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Racine County Sheriff because the plaintiff is confined at the Racine County Jail.

The court **ORDERS** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss

the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court also advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing the case without further notice.

The court will include a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin this 17th day of March, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**